**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| COBB COUNTY SCHOOL DISTRICT, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:14-CV-02794-RWS |
| D.B., by and through his parents and next friends, G.S.B. and K.B., G.S.B. and K.B., individually, | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

**<u>ORDER</u>**

This case comes before the Court on Defendant's Motion in Limine and/or to Dismiss to Limit the Issues Which Plaintiff May Present in its Appeal ("Defendant's Motion in Limine") [24], Defendant/Counterclaimant D.B.'s Et Als [sic] Motion for Final Judgment on the Record ("Defendant's MJAR") [31], and Plaintiff Cobb County School District's Motion for Summary Judgment ("Plaintiff's MSJ") [32].  After reviewing the record, the Court enters the following Order.

**Background**

This case involves the efforts of the Cobb County School District and

D.B.'s parents to provide D.B., an autistic child, with a "Free and Appropriate

Public Education," and comes before this Court on the appeal of an

administrative law judge's determination below.  (See Final Decision, Dkt. [1-

1].)

## I.    Factual Background

Defendant D.B. is eligible for special education services under the

Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C.

§§ 1400 et seq.  At the time relevant to this case, D.B. was a five-year-old

student at East Side Elementary School in the Cobb County School District (the

"District"), where he began kindergarten on August 7, 2013.  Previously, D.B.

attended pre-kindergarten in the Atlanta Independent School District ("APS"),

where he received an Individualized Educational Program ("IEP") based on his

eligibility under the IDEA categories of autism and speech language

impairment.

On August 6, 2013, D.B.'s IEP Team, including his parents, Defendants

G.S.B. and K.B., met to discuss D.B's IEP.  Defendants provided D.B.'s

February 21, 2013 IEP from APS and an APS psychological evaluation, but did

not provide D.B.'s medical records.  The APS records and the parents'

2

statements became the basis for the District's IEP.  Defendants represented that the problem behaviors listed in the APS IEP had been "extinguished in the fall of 2012."  The IEP team concluded that D.B.'s behavior impedes his learning and could be supported through goals and objectives.  At that time, the parents requested a functional behavioral assessment ("FBA") in light of potential transitional issues.

FBAs rely on the premise that all behaviors serve a purpose.  With this in mind, FBAs attempt to identify the underlying reasons and environmental variables that contribute to problem behaviors.  Information gathered through the FBA helps evaluators design a Behavior Intervention Plan ("BIP") with strategies to reduce or eliminate conditions that encourage problem behaviors and to create conditions that encourage positive behaviors.

IDEA provides no explicit requirements for FBAs.  Rather, industry standards provide the framework for such an evaluation.  FBAs may be conducted by educators or behavioral analysts.  First, the evaluator relies on teacher and parent interviews, direct observation, and school records to identify targeted behaviors and form a hypothesis about the purpose of the problem behaviors.  Next, the evaluator collects "ABC"—Antecedent, Behavior,

3

Consequence—data.  "Antecedents" are events or environmental conditions that precede (and presumably trigger) problem behaviors.  "Behavior" refers to behavior topographies, which describe how the behavior looks.  "Consequence" data records the immediate aftermath of the behaviors.  The evaluator looks for patterns in the ABC data to create a hypothesis about the function of the problem behaviors.  Because FBAs have no explicit requirements, analysts may exercise substantial discretion in tailoring their data collection to the particular student.  But analysts must ensure the accuracy of the data by, e.g., including explanations and demonstrations of data collection, asking data takers to define variables to ensure understanding across all data takers, observing data collection, or providing feedback during the collection.

If the evaluator is confident in the FBA's results, the evaluation may end there.  But if the evaluator seeks a more precise evaluation, the next step is a Functional Analysis ("FA").  In an FA, the evaluator "manipulates environmental conditions repeatedly to see if they can replicate rates of behavior . . . to see under which conditions the behavior is going to be repeatedly exhibited."  (Dkt. [1-1] at ¶ 14.)  An FA is the "only way to make definitive causal statements about the functions of the behavior."  (Id.)  Even

AO 72A
(Rev.8/82)

so, most FBAs conducted outside a clinical setting do not include FAs.

As the 2013 school year commenced, D.B.'s teachers presented demands to D.B. similar to his neurotypical peers, relying on Defendant's statements that: D.B. performed at those levels, academic demands were preferred, and problem behaviors had been extinguished.  Yet when presented with these demands, D.B. exhibited "severe behavior outbursts," during which he pulled his hair, bit, scratched, pinched, and attempted to bang his head.  D.B. directed these behaviors not only towards himself, but also towards the adults trying to help him.  In addition to these outbursts, D.B. exhibited vocal and motor stereotypy throughout the day.

The District engaged Integrated Behavioral Solutions ("IBS") to conduct D.B.'s FBA.  Erica Cooper was assigned to D.B.'s case.  Ms. Cooper is a licensed Board Certified Behavior Analyst ("BCBA") and holds a Master's degree in Pyschology, with a focus on Applied Behavior Analysis ("ABA").  She has experience conducting, designing, and performing over one hundred FBAs, most of which were for students with autism and a portion of which included an FA.  She has created over one hundred BIPs.

Cooper began her evaluation on September 4, 2013.  First, she spent four

hours observing D.B. at school and interviewing school staff about D.B.'s behavior.  At school, D.B. cried; threw and swiped materials; escaped from his chair; kicked, hit, and banged his head into adults; ran into walls; and banged his own head.  Cooper observed these behaviors in "tantrum-like" episodes—multiple behaviors within twenty seconds—and D.B.'s teachers confirmed that these tantrums were typical of D.B.'s behavior.

Cooper visited the school four more times: on September 11, 16, and 27, and October 1, 2013.  During those visits, she interviewed teachers about their observations and strategies and D.B.'s responses.  She also trained Melanie Kirby, D.B.'s special education teacher, and Nadine Friedly, D.B's behavior support specialist, in data collection and directly observed D.B. for a total of sixteen hours.

On September 11, 2013, Cooper attended a second IEP meeting held to address D.B.'s behavior problems.  At that meeting, she heard D.B.'s teachers' and parents' accounts of his behavior.  D.B.'s parents said they did not see the problem behaviors observed in the school setting at home.[1]  Cooper reviewed

---

[1]  The ALJ found, despite conflicting testimony, that the evidence "clearly indicates that [the parents] downplayed [D.B.'s] behavior problems and did not disclose records that demonstrated behavior problems."  (Dkt. [1-1] ¶ 9.)

6

all records that were made available to her, including APS's Psychological

Evaluation and the Cobb County IEP.

Cooper used an ABC format to collect her data, a format that is

"customary" in ABA.  (Id. ¶ 19.)  She customized a form "Behavior Checklist"

on which she and other observers would record behaviors as episodes rather

than as individual topographies with distinct antecedents and consequences.

This decision was based on her own observations, corroborated by D.B.'s

teachers, that D.B.'s behaviors occurred in tantrum-like episodes and her

professional opinion that one antecedent preceded all behaviors in the tantrum.

Data collection occured over a period of ten school days.  During this

time, observers documented 98 problem behavior episodes.  In addition to

observing D.B. directly, Cooper trained Kirby and Friedly in data collection.

Both had prior experience collecting data.  Cooper discussed the Behavior

Checklist with them and they exchanged emails regarding questions.  Some or

all of the training took place during the data collection period.  Cooper also

observed Kirby and Friedly and concluded that they were collecting data

accurately.

Cooper's data collection focused primarily on the antecedent and

behavior data.  She tailored her form to reflect only those consequences that she had observed to be "meaningful" to D.B.  Collectors counted each episode until behaviors had ended for one minute.  Cooper hypothesized that individual behavior topographies did not necessarily correlate with a single function. Additionally, she theorized that behaviors could change based on what D.B. had access to (e.g., kicking versus swiping materials away).

Cooper compiled her findings in her FBA report dated October 2, 2013. She revised the report on October 30, 2013 to correct a typographical error. The FBA identifies D.B.'s problem behaviors and predicts when behaviors were most and least likely to occur.  Cooper concluded that D.B.'s behaviors relate to three functions: (1) escape/avoidance, (2) access to preferred items/activities, and (3) automatic reinforcement.  D.B. exhibits the same behaviors for functions (1) and (2).  Function (3) related only to his vocal and motor sterotypy behavior, which is typical for how those behaviors manifest in children with autism.

On October 29, 2013, Cooper drafted a BIP using her conclusions from the FBA.  D.B.'s parents disagreed with the FBA and, finding it inappropriate, requested an independent FBA.

8

Defendants then engaged the founder of Southern Behavioral Group, Dr.
Michael Muller, BCBA-D, to conduct an independent FBA and FA.

Dr. Mueller observed D.B. on three separate days for a total of about ten
hours.  Dr. Mueller also spoke with school staff, but did not formally interview
them.  Dr. Mueller describes a functional analysis as "replicating events or
scenarios or conditions that were observed to happen in the classroom that
were confounded by other events."  (T. at 955.)  The functional analysis
therefore generates more precise conclusions because the ABC results are more
clear.  This is in part because in the classroom setting, the teacher may take
action to stop or change the child's problem behavior, especially when the
behaviors may cause injury to the child or others.  As such, the classroom
setting leads to "overlapping patterns," where the interaction between the child
and the adult cause multiple antecedents with different consequences, and
therefore the problem behaviors may stem from a variety of functions.  Dr.
Mueller testified that disruption or interference in the learning environment is
particularly significant if "the behavior is dangerous, severe, meaning someone
is getting hurt, the child is hurting himself, [or] property is being broken or
destroyed."  (T. at 959.)  The functional analysis prevents this disruption or

interference by creating controlled conditions in which the analyst may directly assess whether a particular consequence reinforces the behavior.  This leads to more accurate conclusions about the function of the behavior.  An FBA may have multiple FAs conducted for multiple problem behaviors.  (T. at 966.)  Dr. Mueller conducted separate FAs on D.B.'s aggression and disruptive behavior.[2] (T. at 972.)

At the time of the administrative hearing, Dr. Mueller had not completed his report, but he did provide charts summarizing his data.  Dr. Mueller's FA revealed that D.B.'s problem behaviors were reinforced by different functions. His conclusions partially contradict Cooper's: Dr. Mueller found that the primary function of D.B.'s aggression was the seeking of a preferred item rather than avoidance of an academic demand.

Defendants seek reimbursement for Dr. Mueller's evaluation.

## II.   Procedural Background

In the underlying administrative proceeding, Plaintiff Cobb County

---

[2]  Dr. Mueller defined "disruptive behavior" as "flopping, dropping to the ground from a standing or seated position, screaming . . ., [h]itting, kicking or throwing materials at objects[—]hitting a desk, kicking a desk, slapping the wall[—a]nd swiping or throwing materials."  (T. at 972.)

School District initiated an action before the Office of State Administrative Hearings pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §1400, *et seq.*, O.C.G.A. § 20-2-152, Georgia Board of Education Rules 160-4-7-.12(3)(u), and 34 C.F.R. § 300.516(a), to defend Cooper's FBA.

The stated purpose of IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education ("FAPE") that emphasizes special education and related services designed to meet their unique needs. . ." 20 U.S.C. § 1400(d)(1)(A). If the parents of a disabled child are dissatisfied with their child's individualized education program ("IEP"), IDEA requires the educational agency to afford them an impartial due process hearing. 20 U.S.C. § 1415(f)(1)(A).

But the posture of the parties in this case is different from that of the typical IDEA action. Here, the District brought an administrative action in response to a request from Defendants for an independent educational evaluation ("IEE"). Defendants claim that theDistrict's evaluation was inappropriate and inadequate for planning D.B.'s IEP and, accordingly, violated rights established under 20 U.S.C. § 1415(b). Defendants therefore

11

engaged their own expert, Dr. Mueller, to conduct an independent FBA.

An administrative hearing was held in the Georgia Office of State Administrative Hearings over seven days from January 15, 2014 to March 26, 2014. (Dkt. [1-1] at 1 n.1.) While Defendants' expert had not completed his assessment at the time of the administrative hearing, he testified as to his observations of D.B. up to the time of trial. On June 3, 2014, the Administrative Law Judge ("ALJ") issued a final decision ("Final Decision," Dkt. [1-1]), finding, at bottom, that Plaintiff's "FBA data lacked sufficient reliability and thus, is not appropriate." (Id. at 1.)

Specifically, the ALJ found that the District's FBA failed in one significant regard: "Cooper's FBA is not appropriate because the data collection, as designed, was never going to provide a reliable enough conclusion as to the functions of D.B.'s serious and problematic behaviors." (Id. at 18 ¶ 8.) The ALJ found fault with the District's FBA in that "data was not taken on the very responses to behavior that the FBA concludes were the functions of D.B.'s behavior: escape/avoidance and access to preferred items." (Id. at 18 ¶ 9.) The ALJ concluded that the antecedents to D.B.'s problem behaviors "*may* have been correctly identified," but that the FBA essentially

12

had "no data" to support its two primary conclusions.  (Id.)

Based upon her findings, the ALJ granted Defendants' request for an IEE at public expense.  (Id. at 1.)  Plaintiff appealed to this Court.

## Discussion

### I.      Motions for Judgment on the Record [31], [32]

Both parties move for a determination on the merits.  Summary judgment decisions in IDEA cases are "better described as judgment[s] on the record." Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys., 349 F.3d 1309, 1313 (11th Cir. 2003) (citing Beth B. v. Van Clay, 282 F.3d 493, 496 n. 2 (7th Cir. 2002)). Accordingly, the Court construes Plaintiff Cobb County School District's Motion for Summary Judgment [32] as a motion for judgment on the administrative record.

### A.      Legal Standard

IDEA provides that the Court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C). This Court previously ruled that supplemental discovery was unnecessary;

13

accordingly, it now decides the motions before it on the administrative record. (See Nov. 25, 2014 Order, Dkt. [20].)

Federal Rule of Civil Procedure 56's summary judgment principles do not apply in IDEA cases. Loren F., 349 F.3d at 1313. "[S]ummary judgment in IDEA cases has been deemed appropriate even when facts are in dispute, and is based on a preponderance of the evidence." Id. (internal modifications and citation omitted). It is for this reason that the district court's decision is more aptly described as "judgment on the record," which is "simply a procedural vehicle requiring the district judge to decide the IDEA action on the basis of the administrative record." Id. at 1313 n. 4 (internal modifications and citations omitted).

The district court's review of an administrative decision in an IDEA case is deferential. "[T]he administrative decision in an IDEA case is entitled to due weight and the court must be careful not to substitute its judgment for that of the state educational authorities." Walker Cnty. Sch. Dist. v. Bennett ex rel. Bennett, 203 F.3d 1293, 1297 (11th Cir. 2000). Even so, "the extent of the deference to be given to the administrative decision is left to this Court's discretion." Id. This Court "must consider the administrative findings but is

free to accept or reject them." <u>Id.</u> at 1298.  Nevertheless, "administrative factfindings 'are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why.' " <u>Loren F.</u>, 349 F.3d at 1313 n. 5 (quoting <u>M.M. v. Sch. Dist. of Greenville Cnty.</u>, 303 F.3d 523, 531 (4th Cir. 2002)).

"A court reviewing an administrative decision under the IDEA asks only two questions: (1) whether the school complied with the IDEA's procedural requirements, and (2) whether the IEP developed for the student is 'reasonably calculated to enable the student to receive educational benefits.'" <u>K.I. ex rel. Jennie I. v. Montgomery Pub. Sch.</u>, 805 F. Supp. 2d 1283, 1291 (M.D. Ala. 2011) (quoting <u>Loren F.</u>, 349 F.3d at 1312).

With this legal standard in mind, the Court now reviews the ALJ's decision.

B.      Analysis

Defendants seek reimbursement for the FA performed by Dr. Mueller after they determined Cooper's FBA to be inappropriate.  Essentially, Defendants argue that the District violated IDEA by failing to properly evaluate D.B.  Plaintiff has the burden on this appeal to show that the District's

15

FBA met the statute's requirements.

The Court finds it instructive to begin, again, with IDEA's underlying purpose: "to ensure that all children with disabilities have available to them a free appropriate public education ("FAPE") that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). A school district provides a student with a FAPE when it "provid[es] personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 203 (1982).

Under IDEA, parents have a right to obtain an independent educational evaluation of the child. 20 U.S.C. § 1415(b)(1). Under IDEA's implementing regulations, the parents may obtain an IEE at public expense if they disagree with the district's evaluation. 34 C.F.R. § 300.502(b)(1). If the district does not agree to the additional IEE at public expense, it may file a due process complaint to request a hearing to show that its evaluation is appropriate. 34 C.F.R. § 300.502(b)(2)(i).

At such a due process hearing, the school district has the burden of proof to show that its assessment is adequate. See Schaffer ex rel. Schaffer v. Weast,

16

546 U.S. 49, 62 (2005) ("The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief.").  The ALJ appropriately placed that burden on Plaintiff at the administrative hearing. (Dkt. [1-1] at 14 ¶2.)

When assessing the adequacy of a district's evaluation, IDEA's implementing regulation 34 C.F.R. § 300.304 provides the relevant standard. Under that regulation, the school district is required to: (1) "[u]se a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child," (2) "not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability and for determining an appropriate educational program for the child," and (3) "[u]se technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors."  34 C.F.R. § 300.304(b)(1)-(3).  Additionally, under 34 C.F.R. § 300.304, the school district must ensure that any assessment or evaluation is: (1) "selected and administered so as not to be discriminatory on a racial or cultural basis," (2) "provided and administered in the child's native language or other mode of communication and in the form most likely to yield

17

accurate information on what the child knows and can do academically,

developmentally, and functionally," (3) "used for the purposes for which the

assessments or measures are valid and reliable," (4) "administered by trained

and knowledgeable personnel," and (5) "administered in accordance with any

instructions provided by the producer of the assessments."   34 C.F.R.

§ 300.304(c)(1)(i)-(v).   Further, the district must ensure that the assessment or

evaluation is tailored to assess specific areas of educational need, 34 C.F.R.

§ 300.304(c)(2), and selected and administered to best reflect the child's

aptitude of achievement level despite any impaired sensory, manual, or

speaking skills.   34 C.F.R. § 300.304(c)(3).   The child must also be assessed in

all areas related to his suspected disability.   34 C.F.R. § 300.304(c)(4).   If the

child transfers from one school district to another in the same school year, the

district must coordinate with a child's prior and subsequent schools.   34 C.F.R.

§ 300.304(c)(5).   In addition, the evaluation must be sufficiently

comprehensive to identify all of the child's special education and related needs,

not just those commonly linked to the child's disability category.   34 C.F.R.

§ 300.304(c)(6).   Finally, the assessment tools and strategies must provide

relevant information that directly assists determination of the child's

educational needs.  34 C.F.R. § 300.304(c)(7).

An FBA is an "educational evaluation" under IDEA.  See Harris v. D.C., 561 F. Supp. 2d 63, 67 (D.D.C. 2008).  Neither party here contests that premise, and the Court finds that this understanding comports with IDEA's statutory framework and its implementing regulations.  See id. ("The regulations implementing the IDEA nowhere define 'educational evaluation,' but they do stress the broad scope of evaluations in general, defining 'evaluation' as 'procedures used ... to determine whether a child has a disability and the nature and extent of the special education and related services that the child needs.'") (quoting 34 C.F.R. § 300.15).

Beyond the implementing regulations' requirements for IDEA evaluations, no mandatory standards circumscribe FBAs.  FBAs should "attempt[] to identify the likely triggers to and the appropriate interventions for problem behaviors."  D.B. ex rel. C.B. v. Houston Indep. Sch. Dist., No. CIV.A. H-06-354, 2007 WL 2947443, at *2 n.6  (S.D. Tex. Sept. 29, 2007).

Plaintiff argues that the ALJ erred because she did not apply the relevant law.  But the Court finds that the ALJ committed no legal error in her analysis.

The ALJ used the relevant legal standard to assess the District's FBA.  In

her Conclusions of Law, the ALJ first set forth the statutory and regulatory

requirements of 14 U.S.C. § 1415(b)(1) and 34 C.F.R. §§ 300.502 and 300.304.

(Dkt. [1-1] at 15-16.)  She next properly concluded that an FBA conducted to

assess the need for special education and related services is an "evaluation"

under IDEA.  (Id. at 16 ¶ 5.)  She then considered the appropriateness of the

District's FBA.  While the ALJ did not explicitly work through each of the

factors in 34 C.F.R. § 300.304, the Court concludes that she did apply that legal

standard.  The ALJ concluded that "Cooper reviewed and documented the

information she received from the District, parents, and other sources

thoroughly."  (Id. ¶ 8.)  Additionally, she concluded that Cooper "adequately

trained" the staff to collect data.  (Id.)  Moreover, the "Report contained all the

necessary sections by industry standards."  (Id.)  The ALJ acknowledged that

Cooper administered the FBA in D.B.'s native language—English—and

without bias toward race or culture.  (Id. ¶ 17.)  Accordingly, the District's

FBA fulfilled all of § 300.304(c)(1)'s requirements.

    But the FBA was inappropriate, the ALJ concluded, because the data

collection "was never going to provide a reliable enough conclusion as to the

functions of D.B.'s serious and problematic behavior."  (Id. at 18 ¶ 8.)  The

20

Court refers back to IDEA's implementing regulations: the assessment tools and strategies *must* provide *relevant* information that *directly* assists persons in determining the educational needs of the child. 34 C.F.R. § 300.304(c)(7). The ALJ concluded that Cooper's FBA did not provide data about the functions of D.B.'s problem behaviors and encourage positive behaviors. And the function of D.B.'s behavior is highly relevant, if not crucial, to determining how to reduce or eliminate problem behaviors. Without this information, the District cannot determine D.B.'s educational needs or develop an effective IEP, and therefore cannot provide a free appropriate public education as required by IDEA.

The ALJ found that D.B. required a more thorough assessment than that accomplished by Cooper's FBA. Her findings relied on the seriousness of D.B.'s violent and aggressive behaviors toward himself and others. (Id. at 19 ¶ 11.) Such serious behaviors require a more definitive identification of the functions of these behaviors. The ALJ concluded that the District's FBA was insufficient because it did not take data on escape/avoidance and access to preferred items. (Id. at 18 ¶ 9.) She further concluded that the FBA did not reliably collect data as to the consequences of D.B.'s behavior. In support of

this finding, the ALJ cited numerous failures that "preclude a statistical and reliable assessment concluding [escape/avoidance and access to preferred items] are the functions." (Id.)

As explained *supra* at Part I.A, the Court is deferential to the ALJ's findings of fact.  Having presided over a multi-day hearing that produced a record of over one thousand pages, she is in the best position to weigh the balance of the evidence and the credibility of the witnesses.  After considering all of the evidence, the ALJ was persuaded by the Defendants' witnesses, and this Court will not lightly set aside her reasoned judgment.

And the Court finds that her judgment was sound and supported by a preponderance of the evidence.  For example, Cooper chose to collect data on D.B.'s behavior by tantrum-like "episodes."  (Id. ¶ 21.)  The ALJ acknowledged that this method is scientifically sound, but determined that this method was less reliable than recording separate topographies as distinct events within the tantrum because of the "'very low likelihood' that all the behaviors D.B. was exhibiting have the same antecedent and consequence."  (Id.)  Additionally, the ALJ found that Cooper's data collection focused on the antecedent and behavior data, with less reliable data on consequences.  (Id.

22

¶ 25.)  The ALJ also found problems with Cooper's data collection, such as the Behavior Checklist's lack of data from the general education setting.  (Id. ¶ 26.) At first, D.B. was scheduled to be in a general education class each day, but was often removed for inappropriate behavior; none of these episodes were recorded in Cooper's data.  (Id.)  Additionally, Kirby initialed the Behavior Checklist as the observing data collector on at least two occasions where she did not actually witness the recorded behavior.  (Id.)  But perhaps most distressingly to the ALJ, Cooper ultimately concluded that the function of all D.B.'s problem behavior was either escape/avoidance of aversive tasks or a desire to access preferred items/activities—but Cooper *never* marked either of those consequences on her Behavior Checklist.  (Id. ¶ 26, ¶ 32; id. at 18 ¶ 9.)

The ALJ concluded that Cooper based her hypotheses significantly on interviews and personal observations but insufficiently on actual data.  (Id. ¶ 30.)  She questioned the reliability of subjective measurements like interviews and observation.  (Id. ¶ 31.)  She also found "two noticeable errors" in Cooper's FBA: (1) a chart that contains incorrect numbers, providing antecedents for only 88, rather than 98, episodes; and (2) a paragraph that "makes little sense in relation to the rest of the Report and District testimony"

that appears to have been pre-written, not for D.B.'s evaluation specifically.

(Id. ¶ 33.)  At bottom, the ALJ had myriad reasons to find that Cooper's FBA

was not reliable.  Cf. H.D. ex rel. A.S. v. Cent. Bucks Sch. Dist., 902 F. Supp.

2d 614, 627 (E.D. Pa. 2012) ("there is nothing in the record to suggest the FBA

is flawed").  This Court will not upset her findings based upon this record.

Plaintiff argues that the ALJ should have excluded evidence of Dr.

Mueller's FA and that this Court should similarly disregard any evidence or

arguments based on Dr. Mueller's FA.

The Court agrees that the relevant question here is not whether Dr.

Mueller's FA was a superior evaluation.  See, e.g., Kerkam v. McKenzie, 862

F.2d 884, 886 (D.C. Cir. 1988) ("[P]roof that loving parents can craft a better

program than a state offers does not, alone, entitle them to prevail under the

Act."); Judith S. v. Bd. of Educ. of Cmty. Unit Sch. Dist. No. 200, No. 97-C-

2899, 1998 WL 409416, at *6 (N.D. Ill. July 15, 1998) ("[t]he fact that the

parents were able to retain an educational consultant to provide a more

complete battery of exams than the school district cannot, by itself, imply that

the district's evaluation was insufficient.").  Rather, the question is whether

Cooper's FBA meets the minimum requirements of IDEA with respect to

24

D.B.'s individual needs.  To that end, the Court finds that the ALJ appropriately considered Dr. Mueller's testimony and evaluation.  D.B. engaged in serious, dangerous problem behaviors that could result in injury to himself or others.  The ALJ weighed the testimony of each expert and concluded that, in light of the seriousness of D.B.'s behavior, Cooper's FBA did not go far enough to evaluate his behavior's functions—not in comparison to Dr. Mueller's FA, but under the requirements of the statute and its implementing regulations.  And without a thorough and accurate evaluation of D.B.'s behavior, the District cannot craft an IEP that ensures that D.B. will receive a free appropriate public education.

There is ample evidence in the record—certainly more than a preponderance—to support the ALJ's finding that Cooper's FBA was insufficient to evaluate D.B.'s educational needs.  Again, IDEA's implementing regulations require that the "[a]ssessment tools and strategies provide *relevant* information that *directly* assists" determination of the child's educational needs.  34 C.F.R. § 300.304(c)(7) (emphasis added).  Considering what is at stake here—a disabled child's access to a free appropriate public education—the Court agrees with the ALJ's decision that the FBA did not

25

fulfil IDEA's requirements.  Accordingly, the administrative decision is **AFFIRMED**.

## II.     Defendants' Motion in Limine [24]

In light of the Court's conclusion above, Defendants' Motion in Limine [24] is **DENIED as moot**.

### Conclusion

For the foregoing reasons, Defendant's Motion in Limine and/or to Dismiss to Limit the Issues Which Plaintiff May Present in its Appeal [24] is **DENIED as moot**.  Defendant/Counterclaimant D.B.'s Et Als [sic] Motion for Final Judgment on the Record [31] is **GRANTED** and Plaintiff Cobb County School District's Motion for Summary Judgment [32] is **DENIED**.

**SO ORDERED**, this 28th day of September, 2015.

_____
**RICHARD W. STORY**
United States District Judge

26